In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-1205

MOHSIN YAFAI and ZAHOOR AHMED,

*Plaintiffs-Appellants*,

*v.*

MIKE POMPEO, Secretary of State, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cv-09728 — **Sara L. Ellis**, *Judge*.

On Petition for Rehearing En Banc.

MAY 23, 2019

Before WOOD, *Chief Judge*, and FLAUM, EASTERBROOK, KANNE, ROVNER, SYKES, HAMILTON, BARRETT, BRENNAN, SCUDDER, and ST. EVE, *Circuit Judges*.

PER CURIAM. On February 15, 2019, plaintiffs-appellants filed a petition for rehearing and rehearing en banc. The panel voted to deny rehearing, and a majority of the judges in active service voted to deny rehearing en banc. Chief Judge Wood

and Judges Rovner and Hamilton voted to grant rehearing en banc. It is therefore ordered that the petition for rehearing and for rehearing en banc is **DENIED.**

BARRETT, *Circuit Judge*, joined by FLAUM, *Circuit Judge*, respecting the denial of rehearing en banc. In the ordinary course, it is unnecessary to say anything more about a case once it becomes the law of the circuit. But three of our colleagues, dissenting from the denial of rehearing en banc, have published an opinion that does more than just repeat the arguments already made by the panel dissent. These new points merit a response, lest it appear that the court did not consider them in deliberating whether to rehear the case. It is also important to clearly reject any implication that the panel's opinion in *Yafai v. Pompeo* endorses a system in which the executive branch is free to deny visa applications on the basis of bias or whim.

*Yafai* is about the amount of explanation that a consular official must provide when he denies a visa application that affects the constitutional right of an American citizen. The Supreme Court has held that, absent a showing of bad faith, a consular officer need only cite to a statute under which the application is denied. *See Kerry v. Din*, 135 S. Ct. 2128 (2015) (Kennedy, J., concurring); *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018). The officer in *Yafai* did that, but our dissenting colleagues would require more. They are not alone in pressing that argument: Supreme Court justices have made the same point in dissents from the controlling cases. The Court has repeatedly rejected it, however, so we are required to reject it too.

\* \* \*

The panel opinion provides a more thorough discussion of the facts, *see Yafai v. Pompeo*, 912 F.3d 1018 (7th Cir. 2019), but we provide an abbreviated version here. Mohsin Yafai and Zahoor Ahmed were born, raised, and married in Yemen.

Yafai became a naturalized United States citizen in 2001. Several years later when Ahmed applied to become a citizen, a consular officer denied her visa application. The officer based the denial on attempted smuggling under 8 U.S.C. § 1182(a)(6)(E), which provides that "[a]ny alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is inadmissible." The consular officer both cited to the statute and provided the factual basis for the decision: "You attempted to smuggle two children into the United States using the identities Yaqub Mohsin Yafai and Khaled Mohsin Yafai."

Yafai and Ahmed requested that the consular officer reconsider his decision. They said that Yaqub and Khaled were their children but that both had tragically drowned. The consular officer agreed to reconsider the application and requested that Ahmed provide additional documents about the children. While the decision was still pending, the officer wrote in an email to Yafai and Ahmed's attorney that "your clients do not testify credibly, testify contradictorily, deny the existence of evidence, and otherwise cast doubt on the accuracy of their responses." The officer later reaffirmed the visa denial for attempted smuggling under § 1182(a)(6)(E).

Yafai and Ahmed subsequently filed suit challenging the denial under the Declaratory Judgment Act and the Administrative Procedure Act. They did not contend that the officer's decision resulted from racial, religious, political, or any other kind of bias. Instead, their claim sounds in procedural due process: they maintained that the officer could not deprive Yafai of his liberty interest in bringing his

wife to America absent a more detailed explanation for why she is inadmissible.

Everyone agrees that due process is satisfied if the consular officer provides a "facially legitimate and bona fide" reason for his decision. *See Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972). The dispute is about what it takes to satisfy this standard. Our dissenting colleagues maintain that a consular officer must provide more than a citation to a statutory basis for the denial; in their view, the officer must also be able to point to some factual support for his decision. Unfortunately, that argument is foreclosed by Supreme Court precedent.

*Mandel* provides the foundational rule: it holds that when the executive offers a "facially legitimate and bona fide reason" for denying a visa, courts will not "look behind the exercise of that discretion." *Id.* The Court reached this result over the dissent's protest that "[t]here is no basis in the present record for concluding that Mandel's behavior" violated the statutory provision that the Attorney General cited as the basis for Mandel's exclusion. *Id.* at 778 (Marshall, J., dissenting); *see also id.* ("[W]ithout even remanding for a factual hearing to determine whether there is any support for the Attorney General's determination, the majority declares that his reason is sufficient to override the appellees' [constitutional] interests."). This is the very same argument that our dissenting colleagues make here: they argue that the consular officer's decision lacks any basis in the record and that he must be able to identify evidentiary support for it. Dissenting Op. at 21–22. Whatever the virtues of that position, we are not at liberty to embrace it. We are bound by the Court's opinion in *Mandel*, which held that the Attorney

General was not required to identify the factual support for his decision that Mandel was ineligible for admission.

If *Mandel* were not clear enough, *Din* dispels any doubt about the applicable standard. In *Din*, the petitioner contended that the State Department violated her due process right by denying her spouse's visa application with no more explanation than a citation to a statute prohibiting the issuance of visas to those who have engaged in terrorist activities. *See Din*, 135 S. Ct. at 2139 (Kennedy, J., concurring). Justice Kennedy's concurrence explains:

> Here, the consular officer's determination that Din's husband [Berashk] was ineligible for a visa was controlled by specific statutory factors. The provisions of § 1182(a)(3)(B) establish specific criteria for determining terrorism-related inadmissibility. The consular officer's citation of that provision suffices to show that the denial rested on a determination that Din's husband did not satisfy the statute's requirements. Given Congress' plenary power to "suppl[y] the conditions of the privilege of entry into the United States," *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950), it follows that the Government's decision to exclude an alien it determines does not satisfy one or more of those conditions is facially legitimate under *Mandel*.

> The Government's citation of § 1182(a)(3)(B) also indicates it relied upon a bona fide factual basis for denying a visa to Berashk.

*Id.* at 2140–41. This statement thus rejects the precise argument that the dissenters advance here: that a consular officer must do more than simply cite to a statute whose provisions refer to discrete factual predicates. Justice Kennedy could not be clearer that the statutory citation *alone* suffices to show that the consular officer's decision was *both* facially legitimate and bona fide.

Just last year, the Supreme Court described Justice Kennedy's interpretation of *Mandel* as the one to which it has long subscribed:

> [O]ur opinions have reaffirmed and applied [*Mandel*'s] deferential standard of review across different contexts and constitutional claims. In *Din,* Justice Kennedy reiterated that "respect for the political branches' broad power over the creation and administration of the immigration system" meant that the Government need provide only a statutory citation to explain a visa denial.

*Trump v. Hawaii*, 138 S. Ct. at 2419 (citation omitted). The dissenters dismiss this passage, arguing that it misunderstands what Justice Kennedy said. But we are not free to treat the Court's understanding of either *Mandel* or Justice Kennedy's opinion so lightly. And in any event, the Court's explanation of Justice Kennedy's approach is accurate.

In arguing that the Court misunderstood Justice Kennedy's concurrence, the dissenters reason that while Justice Kennedy may have said that a statutory citation is sufficient, the circumstances of *Din* show otherwise. They rely

on Justice Kennedy's observation that Din admitted in her complaint that Berashk worked for the Taliban government. *See Din,* 135 S. Ct. at 2141 (Kennedy, J., concurring) ("Din, moreover, admits in her Complaint that Berashk worked for the Taliban, which even if itself insufficient to support exclusion, provides at least a facial connection to terrorist activity."). The dissenters take from this statement that Justice Kennedy treated the statutory citation as sufficient only because "[t]here can be no doubt that the government's reliance on the statutory terrorism bar *encompassed* Din's admission that Berashk worked for the Taliban." Dissenting Op. at 25.

There are a number of problems with the dissenters' effort to graft Din's admission onto the test that Justice Kennedy applied. Most significantly, Justice Kennedy himself didn't make it part of the test. He said that citing a statute alone was enough. And neither the *Din* dissenters nor the Court in *Trump v. Hawaii* understood his concurrence to require anything more than that. *See id.* at 2145 (Breyer, J., dissenting) (describing Justice Kennedy's position); *Trump v. Hawaii*, 138 S. Ct. at 2419 (same). That is reason enough to reject the dissenters' position.

But even putting that aside, there *was* doubt about whether Berashk's low-level administrative work for the Taliban government was the basis for the visa denial. *See Din*, 135 S. Ct. at 2145 (Breyer, J., dissenting) ("Perhaps the Department denied the visa because Ms. Din's husband at one point was a payroll clerk for the Afghan Government when that government was controlled by the Taliban. *But there is no way to know if that is so.*" (emphasis added) (citation omitted)). His government work would not have been enough to

disqualify him under the statute, so it was unclear whether the officer judged Berashk's work to be something more than he said that it was or whether the officer thought that Berashk had been involved in terrorist activity unrelated to his job. And because the government's explanation for denying Berashk's visa consisted of a citation to an umbrella statutory provision—and not to a specific subsection within the statute—Din had no idea what the government thought that Berashk had done.

The *Din* dissenters protested that the government owed Din more. The umbrella statutory citation "[did] not permit Ms. Din to assess the correctness of the State Department's conclusion; it [did] not permit her to determine what kinds of facts she might provide in response; and it [did] not permit her to learn whether, or what kind of, defenses might be available." *Id.* at 2146. That argument did not move the concurring justices, however, who maintained that "the Government satisfied any obligation it might have had to provide Din with a facially legitimate and bona fide reason for its action when it provided notice that her husband was denied admission to the country under § 1182(a)(3)(B)." *Id.* at 2141 (Kennedy, J., concurring).[1]

---

[1] We are unsure why our dissenting colleagues say that "[w]e know from the two concurring Justices and the four dissenting Justices that the *Din* Court had before it basic information about the factual predicates underlying the consular officer's decision." Dissenting Op. at 25. Din disclosed the fact of Berashk's government job in the complaint that she filed in the district court, and the United States offered no information about the role that the job played—if any—in its decision. And even if it were permissible for us to piece together a test by counting heads in the *Din* concurrences and dissents, the concurring and dissenting justices had no common ground on this point. The dissenters thought that the process

Here, our dissenting colleagues repeat the arguments that Justice Kennedy's concurrence rejected. It is worth noting, moreover, that the standard they seek is even higher than the one that the *Din* dissenters would have imposed. The *Din* dissenters maintained that the government could satisfy due process by providing "*either* the factual basis for the Government's decision *or* a sufficiently specific statutory subsection that conveys effectively the same information." *Id.* at 2145 (Breyer, J., dissenting) (emphasis added). Our dissenting colleagues want more: they argue that the consular officer must "point to, or at least describe, some evidence supporting the key conclusions she drew *and* link that evidence to the admissibility determination." Dissenting Op. at 26–27 (emphasis added). In other words, the dissenters here claim that a visa denial is not bona fide unless the consular officer not only provides a statutory citation and the underlying facts but also explains his reasoning.

That standard may be desirable but imposing it would be inconsistent with Supreme Court precedent. It is squarely foreclosed by *Mandel*, and, contrary to the dissent's suggestion, *Trump v. Hawaii* does not endorse a court's ability "to look behind the surface of the executive action" in the ordinary course. Dissenting Op. at 30. The passage that the

---

was constitutionally inadequate because "the State Department's reason did not set forth any factual basis for the Government's decision." 135 S. Ct. at 2146 (Breyer, J., dissenting). The concurrence thought that a factual basis was unnecessary. *Id.* at 2141 (Kennedy, J., concurring) ("*Mandel* instructs us not to 'look behind' the Government's exclusion of Berashk for additional factual details beyond what its express reliance on § 1182(a)(3)(B) encompassed.").

dissent invokes as support for that proposition undermines rather than supports it. The Court explained:

> A conventional application of Mandel, asking only whether the policy is facially legitimate and bona fide, would put an end to our review. But the Government has suggested that it may be appropriate here for the inquiry to extend beyond the facial neutrality of the order. For our purposes today, we assume that we may look behind the face of the Proclamation to the extent of applying rational basis review.

*Trump v. Hawaii*, 138 S. Ct. at 2420. In other words, the rule of *Mandel*, also reflected in Justice Kennedy's concurrence in *Din*, is that a reviewing court looks to the face of the order only. In *Trump v. Hawaii*, at the request of the government, the Court assumed that it could look behind the face of the order given the circumstances of that case. That assumption, which the Court carefully confined as one "for our purposes today," does not purport to alter *Mandel*, which we remain bound to follow.

It is telling that the dissenters draw on prison-discipline cases, rather than consular-review cases, as support for the due process standard that they propose. Dissenting Op. at 22–23, 26. The dissenters argue that just as we do in prison-discipline cases, we should ask "only that the officer be able to point to 'some evidence' that supports the critical finding." Dissenting Op. at 22 (quoting *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455–56 (1985)). It is true that when a prison disciplinary proceeding may result in the loss of good-time credits, prison officials must provide, among other things, "a written statement by the factfinder of the evidence

relied on and the reasons for the disciplinary action." *Hill*, 472 U.S. at 454 (citing *Wolff v. McDonnell*, 418 U.S. 539, 563–67 (1974)). And that statement must be "supported by some evidence in the record." *Id.* But the process due in the prison disciplinary context cannot simply be transferred to the entirely different context of consular review. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (explaining that due process is not unrelated to time, place, and circumstance but rather calls for procedural protection as a situation demands). In the latter context, as we have already explained, the executive has only a limited obligation to disclose the basis of his decision. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. at 2419 ("[A]lthough foreign nationals seeking admission have no constitutional right to entry, this Court has engaged in a *circumscribed* judicial inquiry when the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen." (emphasis added)); *Mandel*, 408 U.S. at 766 ("The power of congress to exclude aliens from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard *enforced exclusively through executive officers, without judicial intervention,* is settled by our previous adjudications." (emphasis added) (quoting *Lem Moon Sing v. United States*, 158 U.S. 538, 547 (1895))).

There is no getting around the fact that the Court's approach narrows the scope of a court's authority to review the reasons for a visa denial. That said, the *Din* concurrence does suggest one circumstance in which a court can peek behind what otherwise appears to be a bona fide and legitimate reason for the denial: when the petitioner makes an "affirmative showing" that the consular officer acted in bad faith. *Din*, 135 S. Ct. at 2140 (Kennedy, J., concurring). That is a claim that the petitioner must "plausibly allege[] with

sufficient particularity." *Id.* Because Yafai has not plausibly alleged bad faith here, we do not discuss it further.

* * *

The Supreme Court has repeatedly held that a citation to a statutory provision suffices to show a legitimate and bona fide reason for denying a visa application. It is free to revisit that precedent, but we are not. To be clear, however, our circumscribed role in this context does not invite the executive to reject a visa application with no rational basis or because of religious, racial, or any other kind of bias. Justice Kennedy put it well:

> There are numerous instances in which the statements and actions of Government officials are not subject to judicial scrutiny or intervention. That does not mean those officials are free to disregard the Constitution and the rights it proclaims and protects. The oath that all officials take to adhere to the Constitution is not confined to those spheres in which the Judiciary can correct or even comment upon what those officials say or do. Indeed, the very fact that an official may have broad discretion, discretion free from judicial scrutiny, makes it all the more imperative for him or her to adhere to the Constitution and to its meaning and its promise.

*Trump v. Hawaii*, 138 S. Ct. at 2424 (Kennedy, J., concurring).

WOOD, *Chief Judge*, with whom ROVNER and HAMILTON, *Circuit Judges*, join, dissenting from the denial of rehearing *en banc*. This case requires our court to answer a question of fundamental importance to our immigration system and the rule of law. Is it true that a consular officer has unfettered authority to reject a visa application, no matter what the reason—bias against a religious group, a bad headache, a unilateral decision that people from the country where the officer is stationed are undesirables, or (at best) a solid factual basis for the decision—without any check from the courts? The panel majority in this case (despite its protestations to the contrary) says "yes." *Yafai v. Pompeo*, 912 F.3d 1018 (7th Cir. 2019). It asserts that this holding is compelled by the consular nonreviewability doctrine.

I regard this as a dangerous abdication of judicial responsibility. The Supreme Court has never endorsed such a broad understanding of the consular nonreviewability rule. To the contrary, the Court took care to reject such an absolutist approach in *Kleindienst v. Mandel*, 408 U.S. 753 (1972). Years later, a majority of the Justices again declined to wash their hands of these matters, in *Kerry v. Din*, 135 S. Ct. 2128 (2015). This court's opinions in *Hazama v. Tillerson*, 851 F.3d 706 (7th Cir. 2017), and *Morfin v. Tillerson*, 851 F.3d 710 (7th Cir. 2017), faithfully followed *Mandel* and *Din*, and in so doing illustrated the line between the necessary and appropriate deference to the consular officer's decision, and the judicial review that is essential to ensure that utterly arbitrary decisions, or decisions flowing from impermissible bias or other unconstitutional bases, do not stand. The latter possibilities do not seem to bother the majority of the full court. Instead, it is content to allow a consular officer to offer a naked citation to a statute, thereby concealing whatever reasons she may have

for her decision and insulating herself from any shred of accountability. Even constitutional violations, such as a decision based on racial or religious animus, would be, as a practical matter, immune under the majority's view. Because I view this result as a deeply troubling extension of current law, I dissent from the decision not to rehear this case *en banc*.

I begin with a brief word about whose constitutional rights are violated here. The plaintiff, U.S. citizen Mohsin Yafai, is trying to challenge the decision of a consular officer to reject the visa application of his Yemeni-citizen wife, Zahoor Ahmed. The Supreme Court has not yet definitely ruled on the question whether a U.S. citizen has a cognizable liberty interest in living with his or her spouse. In *Din*, the Justices split on the question: four Justices would have held that the plaintiff did have such an interest, three maintained that she did not, and two assumed for the sake of argument that such an interest existed but found that she had received all the process that was due to her for purposes of the terrorism bar (8 U.S.C. § 1182 (a)(3)(B)). As our court has done in the past, the panel majority adopted the approach of the concurring Justices in *Din*, assuming without deciding that Yafai has a liberty interest in living with his wife.

I would go further, as did Judge Ripple in dissent, and hold that Yafai indeed has such a liberty interest, and that it is protected by the Fifth Amendment to the Constitution. There can be no doubt that he has been personally and adversely affected by the course of events that unfolded. Yafai learned almost nothing about the reasons for the consular officer's refusal to issue the visa for Ahmed. When Ahmed first applied, the consular officer issued a statement accusing her of "attempting to smuggle children into the United States using the

identities Yaqub Mohsin Yafai and Khaled Mohsin Yafai."
These were two of Yafai and Ahmed's children; tragically,
they drowned in an accident on July 8, 2012, while the visa
application was still pending. Yafai and Ahmed had no idea
why the consular officer thought that smuggling had oc-
curred.

Yafai and Ahmed speculated that the officer doubted that
the drowned children were biologically related to them. On
that supposition, they attempted to supplement the record
with corroborating evidence (school records, pre-natal rec-
ords, immunization records, newspaper articles). But they did
not know if this material was pertinent to the consular of-
ficer's concerns, nor did they receive any indication that the
officer so much as glanced at their new evidence. Instead, the
officer issued a second denial that did no more than cite "sec-
tion 6(e)," presumably referring to 8 U.S.C. § 1182(a)(6)(E), the
smuggling ground of inadmissibility. The majority decision
in this court, and now a majority of the full court, find nothing
wrong with this course of events. The panel held that what-
ever due process rights Yafai might have were satisfied, and
that he was not entitled to any more information than he re-
ceived—*i.e.*, none—about the factual basis for the consular of-
ficer's belief that Ahmed has engaged in smuggling.

In dissent, Judge Ripple explained why he thought that
due process demanded more than Yafai received in this case.
He recognized that this conclusion required him to address
the question whether Yafai had a protected liberty interest in
living with his wife in the United States. I have nothing to add
to his analysis in that respect. His dissent compellingly
demonstrates that it would be "far more compatible with the
values of our constitutional tradition" to recognize such a

right than to deny its existence. *Yafai,* 912 F.3d at 1023 (Ripple, J., dissenting). A long line of cases, from *Meyer v. Nebraska*, 262 U.S. 390 (1923), and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), through *Moore v. City of East Cleveland*, 431 U.S. 494 (1977), holds that the government cannot break up or intrude into the family unit without, at a minimum, affording the protections of procedural due process to the family's U.S. citizen members. And, as Judge Ripple reminded us, "the Supreme Court has long recognized the importance of family and the principle that marriage includes the right of spouses to live together and raise a family." *Yafai*, 912 F.3d at 1024 (Ripple, J., dissenting). See, *e.g., Obergefell v. Hodges*, 135 S. Ct. 2584, 2598 (2015); *Loving v. Virginia*, 388 U.S. 1, 12–13 (1967).

That right is protected by the Due Process Clause of the Fifth Amendment. I concur fully with Judge Ripple's reasoning on this issue. Like him, I would find that the government cannot deny a U.S. citizen the possibility of pursuing a life in the United States with his or her non-citizen spouse without observing the basic requirements of due process. Anything less than that would amount to the right to banish any U.S. citizen with the temerity to marry a non-citizen, without so much as a reason—hardly an outcome that comports with the Constitution, as this court observed more than a century ago. See *Moy Suey v. United States*, 147 F. 697, 698–99 (7th Cir. 1906) ("Nativity gives citizenship, and is a right under the Constitution. It is a right that congress would be without constitutional power to curtail or give away. It is a right to be adjudicated in the courts. … The citizen deported is banished, and banishment is a punishment that can follow only a judicial determination in due process of law.")

That said, I would not be urging our court to rehear this case *en banc* only to reach the preliminary question of the right of the U.S. citizen to object to a consular decision that forced him to choose between permanent separation from his spouse or banishment from the United States. If I thought that the government had satisfied the demands of due process in this case, I would, like the majority, leave for another day a definitive ruling on the question of a citizen's liberty interest in his spouse's presence in the United States. But by holding that we are compelled to leave unexamined the government's no-admissibility determination, the panel has wiped out our ability to vindicate *any* constitutional claims brought by a U.S. citizen affected by a visa denial. No matter whether a citizen is attempting to unify his family, asserting a First Amendment right to hear the views of a foreign national (as in *Mandel*, 408 U.S. at 762–65), or seeking redress for some other constitutional injury, the rights in question are illusory if courts have no power to protect them from the Executive's arbitrary and capricious decision-making. Like Judge Ripple, I find the majority's approach inconsistent with our "limited, but important, responsibility to ensure that the Executive administers the immigration process according to the standards enacted by Congress." *Yafai*, 912 F.3d at 1025 (Ripple, J., dissenting).

The issue that demands the attention of the *en banc* court relates to the adequacy of the process followed by the consular official. In order to explain why the government fell short of the constitutional minimum of due process in this case, I return briefly to the underlying facts. As I noted earlier, Yafai is a U.S. citizen trying to obtain a visa for his non-citizen wife, Zahoor Ahmed. He filed the proper I-130 petitions on behalf of Ahmed and the couple's children, but the consular officer

in Yemen denied the application. The officer wrote that the denial was based on 8 U.S.C. § 1182(a)(6)(E), which renders inadmissible "[a]ny alien who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of the law." The officer further asserted that Ahmed "attempted to smuggle two children into the United States using the identities Yaqub Mohsin Yafai and Khaled Mohsin Yafai." The officer did not identify any factual basis whatsoever for that contention, nor can one be found in the record.

The record does indicate, and Yafai *freely admitted*, that the couple had indeed applied for visas on behalf of two children with those names. Yafai and Ahmed explained that these were in fact their children, but that the children had drowned while their applications were pending. Yafai and Ahmed were also seeking visas for their other children. Despite the consular officer's denial of *Ahmed's* visa on the basis of the alleged attempt to smuggle Yaqub and Khaled into the United States, most of the other children received U.S. visas or passports. The consular officer did not explain what it was that justified distinguishing among the couple's children. Nor did the officer offer even a hint about the basis on which she drew the conclusion that Ahmed's inclusion of Yaqub and Khaled in the application amounted to a violation of Section 1182(a)(6)(E) rather than an honest attempt to obtain visas for two of her children who were alive at the time of her application but who later died. Neither Yafai nor we have any idea whether the officer thought that Yafai and Ahmed had *never* had two children named Yaqub and Khaled, or if the officer thought that those two children had existed but were somehow ineligible for admission, or if the parents were trying to smuggle two different children into the United States,

or if the officer had some other concern. That information void made it effectively impossible for Yafai to present an effective rebuttal.

He did try, however. In his petition for rehearing in this court, Yafai says that "[i]t appears that the consular officer determined with no known basis, that the drowned children were not biologically related to Ms. Ahmed … ." Petition for Rehearing at 7. On the assumption that this was the problem—though again, they were left to guess—Yafai and Ahmed tried to respond by adducing a significant amount of evidence showing that Yaqub and Khaled were their biological offspring. That evidence included pre-natal records, immunization records, and school records. An embassy fraud-prevention manager acknowledged receipt of the additional evidence.

In the end, Yafai's efforts were unavailing. Several months later the consular officer reaffirmed the initial denial, citing the same statutory provision, again without any explanation or even a hint that the records had been reviewed and rejected, reviewed and found irrelevant, or thrown away. The consular officer offered only a mysterious comment on Yafai and Ahmed's credibility, but the comment is singularly unhelpful. It has the ring of boilerplate: "your clients do not testify, testify contradictorily, deny the existence of evidence, and otherwise cast doubt on the accuracy of their responses." Which is it: A failure to testify? Testimony that contained contradictions? Refusal to accept incontrovertible evidence? Shiftiness or some other reason to find them not worthy of belief? Who knows? The only thing that is apparent is that the officer's comment is no more illuminating than silence.

Yafai challenged the consular officer's decision in the district court, which ruled against him; he then appealed to this court. The panel majority found that the government had done enough by citing a particular section of the statute, (section 1182(a)(6)E)), which for all we can tell was selected randomly. The panel held that the consular officer "need not disclose the underlying facts that led him to conclude that the statute [*i.e.* the inadmissibility ground] was satisfied." 912 F.3d at 1021. It was enough, the majority thought, for the officer to provide "a facially legitimate and bona fide reason for denying Ahmed's application," *id.*, and the majority accepted that the officer's stated reason for denial met that standard.

At that point, both the majority's opinion and its supplemental statement on the petition for rehearing en banc become hard to follow. On the one hand, the majority asserts in both places that it is forbidden to look behind the stated reason. Yet it concedes that a facially legitimate decision might have been made in bad faith, *id.* at 1022; rehearing statement at 10–11, and if it was, that would be a reason to reject it. But the majority leaves the applicant with no ability to ferret out bad faith. We know this because the majority finds nothing in the unexplained decision in Yafai's case that supports even an inquiry into bad faith. It is impossible to discover bad faith (which includes a disingenuous explanation designed to cover up arbitrariness) without some consideration of the underlying facts—here, the reason why the officer thought that the children were being smuggled. No applicant would ever be able to make "an affirmative showing of bad faith on the part of the consular officer," *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring), without a right to a comprehensible description of the information on which the officer relied.

Unlike the majority, I do not believe that this limited in-
quiry would put us on a slippery slope that ends up in ple-
nary review of consular decisions. Other areas of the law pro-
vide examples of highly deferential review of factual findings.
The majority's supplemental opinion notes the uncontrover-
sial proposition going back at least as far as *Mathews v. El-
dridge*, 424 U.S. 319 (1975), that due process is context-specific.
I have no quarrel with that. My point is only that when a con-
stitutionally protected liberty interest is at stake, as I believe
it is here, *some* process is due. Nothing in *Mathews* contradicts
that point.

In the visa-issuance context, I accept that the process due
is at the minimal end of the spectrum. Moreover, this is not
the only area in which substantial deference to executive au-
thorities is appropriate. Another such area is the prison-disci-
plinary setting. There, we ask only that the officer be able to
point to "some evidence" that supports the critical finding.
See *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S.
445, 455–56 (1985). A comparable light touch would be appro-
priate here—just enough to ensure that there was a permissi-
ble basis for the consular officer's action. The Constitution and
laws of this country require no less, as Judge Ripple ex-
plained:

> We cannot forget, however, that Congress has
> given the Judiciary the obligation to curb arbi-
> trary action. It has made no exception for the ac-
> tion of consular officers. Congress did not, and
> would not, sanction consular officers' making
> visa decisions in a purely arbitrary way that af-
> fects the basic rights of American citizens. We
> have the responsibility to ensure that such

> decisions, when born of laziness, prejudice or
> bureaucratic inertia, do not stand. As long as
> Congress keeps in place our statutory responsi-
> bility, we show no respect for the Constitution
> or for Congress by taking cover behind an
> overly expansive version of a judge-made doc-
> trine.

912 F.3d at 1030 (Ripple, J., dissenting).

Just as in *Hill*, "[a]scertaining whether this standard is sat-isfied does not require examination of the entire record, inde-pendent assessment of the credibility of witnesses, or weigh-ing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the con-clusion reached by the [responsible government actor]." 472 U.S. at 455–56. That limited disclosure would be invaluable to a person seeking to meet his burden of showing bad faith or mistake. I consider it telling that the Supreme Court has been careful not to give the executive branch carte blanche to issue visa denials that provide absolutely no information about the facts on which the decision was based. To the contrary, the Court has carefully reserved this issue each time it has en-countered one of these cases. We should respect the Court's caution as we now resolve the question.

The majority relies heavily on Justice Kennedy's position, but his view is more nuanced than they would have one be-lieve. His concurrence in *Din* captures the process that I be-lieve should have happened (but did not) in Yafai's case. I re-fer to the following passage, in which he is discussing *Kleindienst v. Mandel*, 408 U.S. 753 (1972), and its application to Din's case:

The Government's citation of § 1182(a)(3)(B) [the terrorism bar] also indicates it relied upon a bona fide factual basis for denying a visa to Berashk [the spouse]. Cf. *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15, (1926). Din claims due process requires she be provided with the facts underlying this determination, arguing *Mandel* required a similar factual basis. It is true the Attorney General there disclosed the facts motivating his decision to deny Dr. Mandel a waiver, and that the Court cited those facts as demonstrating "the Attorney General validly exercised the plenary power that Congress delegated to the Executive." 408 U.S., at 769. But unlike the waiver provision at issue in *Mandel*, which granted the Attorney General nearly unbridled discretion, *§ 1182(a)(3)(B) specifies discrete factual predicates the consular officer must find to exist before denying a visa.* Din, moreover, admits in her Complaint that Berashk worked for the Taliban government, … which, even if itself insufficient to support exclusion, provides *at least a facial connection to terrorist activity. Absent an affirmative showing of bad faith on the part of the consular officer* who denied Berashk a visa—which Din has not plausibly alleged with sufficient particularity—*Mandel* instructs us not to "look behind" the Government's exclusion of Berashk for additional factual details beyond what its express reliance on § 1182(a)(3)(B) encompassed. See 408 U.S., at 770.

135 S. Ct. at 2140–41 (emphasis added).[1]

Justice Kennedy noted that he would not require the government to disclose factual details "beyond what its express reliance on § 1182(a)(3)(B) *encompassed*." (emphasis added). There can be no doubt that the government's reliance on the statutory terrorism bar *encompassed* Din's admission that Berashk worked for the Taliban. We know from the two concurring Justices and the four dissenting Justices that the *Din* Court had before it basic information about the factual predicates underlying the consular officer's decision. It thus did not face the naked assertion that a proper ground for denial existed, which is what we have here.

It is also important to note that in *Mandel*, the Attorney General had identified factual material supporting the visa denial. He pointed to the applicant's activities during a past visit to the United States that went beyond the stated purposes of his trip. As Justice Kennedy acknowledged in the passage from *Din* quoted above, the *Mandel* Court "cited those facts as demonstrating 'the Attorney General validly exercised the plenary power that Congress delegated to the

---

[1] Before this court, the government points to a passage in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), that summarized this part of Justice Kennedy's *Din* concurrence as a statement that the Government need provide *only* a statutory citation to explain a visa denial. 576 U.S., at ——, 135 S.Ct., at 2141 (opinion concurring in judgment). 138 S. Ct. at 2419. As I explain, Justice Kennedy did not leave his remarks at that. His comment was particular to the terrorism ground for inadmissibility and it relied on the fact that the Court was able to identify relevant factual materials in the record connecting the statutory ground to the decision—for example, the admission that the spouse worked for the Taliban. Here, even if section 1182(a)(6)(E) also identifies potential factual predicates, the record contains no information to see if any of those predicates exists.

Executive.'" 135 S. Ct. at 2140, quoting *Mandel*, 408 U.S. at 769. My colleagues therefore significantly overstate the case when they assert that *Mandel* "held that the Attorney General was not required to identify the factual support for his decision to show that Mandel was ineligible for admission." Such a statement can be found nowhere in the Court's opinion.

Similarly, the government identified factual material supporting the visa denials in our court's earlier decisions in *Hazama*, 851 F.3d at 709 (undisputed evidence of rock-throwing) and *Morfin*, 851 F.3d at 713 (indisputable indictment for possession of cocaine with intent to distribute). In all of these cases, while the judiciary deferred to the government's *interpretation* of the evidence, "the record foreclose[d] any contention that the [government] was imagining things." *Morfin*, 851 F.3d at 713. The same cannot be said for this case, in which—for the first time—we endorse a visa denial that for all we know was based on no real-world facts at all.

My dispute with the majority turns largely on the meaning and importance of the phrase "facially legitimate and bona fide." Given the facts in *Mandel* and *Din*, along with Justice Kennedy's statement in *Din* that the government had relied upon a "bona fide *factual* basis" for the denial of Berashk's visa, 135 S. Ct. at 2140 (emphasis added), I take "bona fide" to mean derived from actual facts rather than invented out of whole cloth. In the absence of such facts, the agency's mere citation of a statutory ground usually says nothing about whether it has done what the statute requires. Just as in *Hill*, this does not mean that the consular officer must open her entire file to the disappointed applicant. She must merely point to, or at least describe, some evidence supporting the key conclusions she drew and link that evidence to the admissibility

determination. And when undisputed facts in the record already provide "at least a facial connection" to the factual predicates in the cited statutory ground for inadmissibility—as in *Din*—it is possible that no further explanation would be required.

The scope of the court's review will be narrow, as it typically is when the law gives an executive or administrative officer wide discretion. But that discretion is not unlimited; due process—indeed, our constitutional structure and the rule of law itself—demands some accountability. *Cf. Mach Mining, LLC v. E.E.O.C.*, 135 S. Ct. 1645, 1651 (2015) (rejecting EEOC's argument that its compliance with the conciliation mandate in the statute was unreviewable and noting that "Congress rarely intends to prevent courts from enforcing its directives to federal agencies"). I am not willing to give a blank check to the executive branch (and I would not support one for the judiciary or Congress, either—our system depends on carefully calibrated checks and balances).

Suppose, for example, that the consular officer's decision to deny a visa was secretly based exclusively on the fact that the applicant was Muslim (or Hindu, or an atheist). Such a reason, we would all agree, would not be a valid one. Or suppose, unbeknownst to the noncitizen, the consular officer simply stamped "no" on all applications received after 2:00 p.m. That would also be arbitrary and capricious, even under the most generously deferential regime imaginable (perhaps something like AEDPA's). But in either circumstance, as long as the consular simply affixed a one-sentence accusation that cited "smuggling" as the ground for inadmissibility under the statute, the noncitizen would have no way of knowing that the decision had no basis in fact, and thus no way of

challenging it for arbitrariness, unlawfulness, or bad faith. This is the result that the panel majority has endorsed and a majority of the full court is willing to let stand.

Under the panel's rule, a rogue or burned-out consular official could just make up facts. Take this case. The officer apparently accused Ahmed of trying to smuggle two children into the United States (though even that is unclear). That accusation could be pure fabrication. Who is to say, if the officer points to nothing supporting the accusation? Yafai and Ahmed tried to assuage the officer's concerns, but for all we know the officer never bothered to look at their supplemental information. The officer could just as easily have said, with no basis, that Ahmed was likely to engage in prostitution, 8 U.S.C. § 1182(a)(2)(D). But Yafai and Ahmed would never know what they needed to do to correct such a scurrilous accusation. This state of affairs is not consistent with the constitutional standards of due process.

In response to Yafai's petition for rehearing, the government suggests that the Supreme Court's decision in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), forecloses the approach I urge here and instead requires us to rubber-stamp visa denials so long as the government cites any relevant statutory provision. I do not read *Hawaii* in such an indiscriminate way. First, its setting is quite different from the one before us. The Executive Order at issue in *Hawaii* operated at the country level, not the individual level; it involved a presidential Proclamation placing "entry restrictions on the nationals of eight foreign states whose *systems* for managing and sharing information about their nationals the President deemed inadequate." 138 S. Ct. at 2404 (emphasis added). Second, in response to the government's invocation of the doctrine of consular

nonreviewability, the Court noted first that this doctrine does not go "to the Court's jurisdiction, … nor does it point to any provision of the INA that expressly strips the Court of jurisdiction over plaintiffs' claims … ." On that basis, the Court proceeded to evaluate the plaintiffs' various challenges to the Proclamation.

When it reached the claim that the Proclamation was issued for the unconstitutional purpose of excluding Muslims, *id.* at 2415, the Court addressed *Mandel* and *Din. Id.* at 2419–20. Although it described the topic of the admission and exclusion of foreign nationals as *largely* immune from judicial control, *id.* at 2418, it acknowledged that the Court had "engaged in a circumscribed judicial inquiry when the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen." *Id.* at 2419. As it had done before, it took care to save the issue now before us for another day. Rather than saying, as the majority has done, that facts do not matter, the Court distinguished between second-guessing the Executive's exercise of discretion once the facts are established and the authority to look at the underlying justification:

> A conventional application of *Mandel*, asking only whether the policy is facially legitimate and bona fide, would put an end to our review. But the Government has suggested that it may be appropriate here for the inquiry to extend beyond the facial neutrality of the order. … For our purposes today, we assume that we may look behind the face of the Proclamation to the extent of applying rational basis review. That standard of review considers whether the entry policy is plausibly related to the Government's

> stated objective to protect the country and im-
> prove vetting processes. … As a result, we may
> consider plaintiffs' extrinsic evidence, but will
> uphold the policy so long as it can reasonably
> be understood to result from a justification in-
> dependent of unconstitutional grounds.

*Id.* at 2420.

I take several points away from this passage, and from *Hawaii* as a whole. First, consular nonreviewability is not a jurisdictional doctrine. Second, the Court adheres to the basic holdings of *Mandel* and *Din*, insofar as they require a facially legitimate and bona fide reason for the visa decision. Third, the Court has continued to look behind the surface of the executive action to see if it results from "a justification independent of unconstitutional grounds." What the Court did *not* do in *Hawaii*, was to hold (as our panel majority does) that it was *required* to stop with the president's Proclamation and refuse to look at the underlying facts, because the judiciary is categorically barred from doing so. The panel's opinion in our case thus breaks new ground.

The right to demonstrate bad faith is empty if an applicant for the spousal visa has no right to know anything about the information on which the consular officer relied. Due process demands more than this, and the system will not crumble if we follow our constitutional commands. At its root, due process requires that the person subject to a governmental action be given enough information to be able to know what the accusation against her is. A regime in which the consular official can just say "no," and the U.S.-citizen spouse must guess both about the accusation that supposedly supported that decision and—critically—what facts lay behind the "no," is not worthy

of this country. I dissent from our court's denial of rehearing *en banc*.